US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

SEP 16 2016

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

KAREN CONE; LAURIE COX; AND
PATRICIA HOBACK                                          **PLAINTIFFS**

v.                               Case No.: _16-5254 PKH_

SALSARITA'S FRANCHISING, LLC;
COMPASS GROUP USA, INC., d/b/a EUREST
DINING SERVICES; AND JOHN DOES 1-10          **DEFENDANTS**

## COMPLAINT

Plaintiffs Karen Cone, Laurie Cox, and Patricia Hoback, through undersigned counsel,

submit this Complaint against Defendants Salsarita's Franchising, LLC, Compass Group USA,

Inc., d/b/a Eurest Dining Services, and John Does 1-10:

### I. PARTIES

1.      Plaintiffs Karen Cone and Patricia Hoback are residents of the State of Arkansas;

Plaintiff Laurie Cox is a resident of the State of Missouri. At all relevant times, the three

Plaintiffs were employed at the Walmart Home Office in Bentonville, Benton County, Arkansas.

2.      Separate Defendant, Salsarita's Franchising, LLC ("Salsarita's"), is a corporation

organized and existing under the laws of the State of Mississippi, with its principal place of

business in North Carolina. At all times relevant hereto, Salsarita's owned and operated the retail

restaurant "Salsarita's Fresh Cantina," located within the Walmart Home Office Café in

Bentonville, Benton County, Arkansas. At all times relevant hereto, Salsarita's was a

manufacturer and seller of food and drink products at this location. Salsarita's jointly operated

this restaurant in the Walmart home Office Café in Bentonville, Benton County, Arkansas with

separate Defendant Compass Group USA, Inc. Defendant Salsarita's may be served by its

registered agent for service of process, Barry R. Cannada, at its registered office, Highland Colony Parkway, Suite 1400, Ridgeland, MS, 39157.

3.     Separate Defendant, Compass Group USA, Inc. d/b/a "Eurest Dining Services" ("Eurest") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in North Carolina. At all times relevant hereto, Eurest was the foodservice management company that operated the Walmart Home Office Café located within the Walmart Home Office in Bentonville, Benton County, Arkansas. At all times relevant hereto, Eurest operated and controlled all foodservice operations at the Walmart Home Office Café, including the restaurant called Salsarita's Fresh Cantina, owned and jointly operated with separate defendant Salsarita's. Defendant Eurest may be served by its registered agent for service of process, Corporation Service Company, at its registered office, 300 Spring Building, Suite 900, 300 S. Spring Street, Little Rock, AR 72201.

4.     Upon information and belief, Defendants John Does 1-10 are entities who participated in the manufacture, service, and/or sale of the contaminated food products that were the proximate cause of Plaintiffs' injuries, and whose identities are not known to Plaintiffs at this time.

## II. JURISDICTION AND VENUE

5.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and cost.

6.     Venue is proper within this district pursuant to 28 U.S.C. § 1391, in that Defendants sell, market, and/or distribute products within the Western District of Arkansas, and a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## III. FACTUAL ALLEGATIONS

### The Outbreak

7.      In late June 2014, the Arkansas Department of Health announced that an outbreak of Shigellosis had occurred at the Walmart Home Office in Bentonville, Benton County, Arkansas, affecting as many as 275 individuals.

8.      Shigellosis is a bacterial infection (most often *Shigella sonnei*) delivered only by fecal-oral or anal-oral transmission. The incubation period varies from roughly 24 hours to a week. Symptoms include loose stool, abdominal cramps, nausea, vomiting, fever, headache, diarrhea sometimes containing blood or mucous, and convulsions, among other things.

9.      During their investigation, health officials conducted an inspection of the Salsarita's restaurant located at the Home Office. During a June 18, 2014 inspection, inspectors found nine violations. Of the nine violations, five were marked priority, meaning they were concerns that required immediate resolution, including employees not washing hands and employees touching ready-to-eat food without wearing gloves. The inspection report also indicated that juices from raw chicken were found dripping on bottled drinks, that food was stored at dangerous holding temperatures, and that the facility lacked required signage at handwashing sinks.

10.     The investigation concluded that the outbreak was likely caused by contamination of Salsarita's food products by an ill food handler, based on, among other things, the observed critical health violations, reports of ill employees working in the kitchen, the epidemic timeline, and the fact that Shigellosis was reported both by individuals eating at the Home Office Café and by those eating Café food offsite. The Health Department also noted that all restaurants in the Café shared a common kitchen, and that Eurest frequently hired temporary food workers, who

may have lacked prior kitchen experience.

11.     A second inspection of Salsarita's restaurant occurred on June 23, 2014. During this follow-up inspection, inspectors found seven more violations, some of which were repeat violations from the initial inspection.

**Karen Cone's Illness**

12.     Karen Cone lives in Arkansas and is an employee at the Walmart Home Office in Bentonville.

13.     On Friday, June 13, 2014, in preparation for an office birthday party for Karen, another Walmart Home Office employee, Tonnie Ruttan, purchased food items from Walmart Home Office Café, including salsa produced at the Salsarita's restaurant.

14.     At the birthday party for Karen, on Friday, June 13, 2014, Karen consumed the salsa purchased from and produced by the Salsarita's restaurant located in the Walmart Home Office Café. That evening, Friday, June 13, 2014, Karen began to feel nauseous.

15.     The following day, Saturday, June 14, 2014, Karen began experiencing very low energy, dizziness, and joint pain. In the morning of Sunday, June 15, 2014, Karen awoke around 3:00 A.M. with severe diarrhea. By 10:00 A.M., Karen began vomiting and continued to experience near-constant and ever-worsening diarrhea, which was now green in color and highly odorous.

16.     Karen continued to experience worsening gastrointestinal illness as the day continued, becoming gray-faced, dizzy, and sweaty. In the late afternoon, her boyfriend Clay—becoming increasingly worried for his girlfriend's wellbeing—drove Karen to Northwest Medical Center in Bentonville, Arkansas.

17.     Upon entering the Northwest Medical Center Emergency Department, Karen's

heart rate was abnormally low, her white blood count was abnormally high, and she was severely dehydrated. She was admitted to the hospital, placed in quarantine, and diagnosed with colitis.

18.     Upon admittance, a stool sample was taken. Karen's stool tested positive for Shigella bacteria. The bacteria Karen consumed in the contaminated food items manufactured and sold by the Defendants caused her to develop a potentially life-threating illness.

19.     Karen remained in the hospital until June 17, 2014, when she was discharged and was advised to limit her food to bananas, rice, applesauce, and toast until her condition improved. Upon discharge, Karen was still experiencing mild diarrhea and nausea.

20.     Karen continued to experience diarrhea after eating certain foods for four to five weeks after leaving the hospital. She remained extremely exhausted and continued to have joint pain for two months following discharge. Karen continues to suffer some effects of her severe injuries today, including physical limitations and periodic diarrhea and nausea.

### Laurie Cox's Illness

21.     Laurie Cox lives in Missouri and is an employee at the Walmart Home Office in Bentonville, Arkansas.

22.     On Thursday, June 12, 2014, Laurie ordered lunch, which included chips and salsa, from Salsarita's restaurant located in the Walmart Home Office Café. Laurie consumed the salsa produced at the Salsarita's restaurant located in the Walmart Home Office Café.

23.     On Friday morning, June 13, 2014, Laurie, an individual diagnosed with diabetes, began experiencing uncontrollable diarrhea and vomiting, as well as fever and chills. She continued to experience worsened gastrointestinal illness, diarrhea, vomiting, fever, body aches, and chills over the weekend and throughout the following Monday and Tuesday.

24.     On Tuesday, June 17, 2014, Laurie began feeling weak and dizzy and fell

backwards into her bathtub, hitting her head on the back of the shower and her tailbone on the bottom of the tub.

25.     On Wednesday, June 18, 2014, Laurie went to Mercy Medical Clinic in Rogers, Arkansas. She was sent to the Emergency Department at Mercy Hospital due to dehydration. Upon entering the Mercy Hospital Emergency Department, Laurie remained severely dehydrated and continued experiencing symptoms of gastrointestinal illness. She was admitted and diagnosed with enteritis.

26.     Upon admittance, a stool sample was taken. Laurie's stool tested positive for Shigella bacteria. Laurie's stool sample was then sent to the Arkansas Health Department State Lab to be tested, and her stool again tested positive for Shigella bacteria. The bacteria Laurie consumed in the contaminated food items manufactured and sold by the Defendants caused her to develop a potentially life-threating illness.

27.     Upon admittance to the Mercy Hospital Emergency Department, Laurie informed the staff that she had fallen in her bathroom and hit her head and tailbone during the fall. X-rays were taken of Laurie's coccyx. The X-rays revealed that Laurie's tailbone was cracked.

28.     Laurie remained in the Hospital the rest of the day and was discharged in the evening of June 18, 2014. Upon discharge, Laurie continued to experience diarrhea, muscle aches, and fatigue, which persisted for months. She also continued to suffer pain from her tailbone injury, which took 6 to 8 months to heal. Laurie had to sit on a pillow or swim ring to alleviate the pain at work and at home. To this day, Laurie continues to suffer diarrhea after eating certain foods and continues to be limited in her physical activity.

**Patricia Hoback's _Illness_:**

29.     Patricia ("Trish") Hoback lives in Arkansas and is an employee at the Walmart

Home Office in Bentonville, Arkansas.

30.    On Monday, June 9, 2014, or Tuesday, June 10, 2014, Trish ordered the two-taco special for $5.00, which comes with chips and salsa from Salsarita's restaurant located in the Walmart Home Office Café. Trish consumed the salsa purchased from and produced by the Salsarita's restaurant located in the Walmart Home Office Café as part of her lunch.

31.    On Thursday, June 12, 2014, Trish ate at the barbeque restaurant located in the Walmart Home Office Café and run by Eurest, "Exposition." She consumed the food purchased from and produced by the Exposition restaurant located in the Walmart Home Office Café.

32.    On Thursday evening, June 12, 2014, Trish, an individual diagnosed with diabetes, started experiencing stomach discomfort, diarrhea, fever, and chills with constant shaking. Later in the evening her symptoms worsened, and her fever measured 103.5°F. On Friday morning, June 13, 2014, Trish's symptoms were so severe that she had to go to the Emergency Room at Mercy Hospital in Rogers, Arkansas.

33.    Upon entering Mercy Hospital, Trish continued to experience severe abdominal pain, chills, fever, and diarrhea. She was admitted to the hospital where blood work, urine samples, and stool samples were taken. She was diagnosed with intussusception and colitis, and it was soon discovered that she had become septic. A CT scan taken of her intestines revealed an infection in the lower right quadrant of her colon. She was scheduled for immediate surgery to remove the infected area. The bacteria Trish consumed in the contaminated food items manufactured and sold by the Defendants caused her to develop a potentially life-threating illness.

34.    Before surgery, another CT scan was performed on the infected colon, which indicated that the infection could be treated with high doses of intravenous antibiotics, instead of

surgery. Trish remained in the Hospital until Sunday, June 15, 2014.

35.     Upon discharge, Trish continued to feel exhausted and weak. To this day, she continues to suffer from periodic diarrhea and anxiety, and she is limited in her physical activity.

## IV. CAUSES OF ACTION

### Count I – Strict Liability Against All Defendants

36.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

37.     At all times relevant, the Defendants manufactured, distributed, and/or sold the adulterated food product that is the subject of this action.

38.     The adulterated food product that the Defendants manufactured, distributed, and/or sold was, at the time it left each separate Defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained, or was contaminated by, bacteria which is/are dangerous to human health.

39.     The adulterated food product that the Defendants manufactured, distributed, and/or sold was delivered to Plaintiffs without any change in its defective condition. The adulterated food product that the Defendants manufactured, distributed, and/or sold was used in the manner expected and intended, and was consumed by Plaintiffs.

40.     Plaintiffs suffered injury and damages in an amount to be determined at trial as a direct and proximate result of the Defendants' manufacturing, distributing, and/or selling the defective and unreasonably dangerous adulterated food product.

### Count II – Breach of Warranty Against All Defendants

41.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

42.     Defendants are liable to Plaintiffs for breaching express and implied warranties that they made regarding the adulterated food product that caused Plaintiffs' illness and injuries.

These express and implied warranties included the implied warranties of merchantability and/or fitness for a particular use.

43.    Specifically, the Defendants expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the subject food product was fit for human consumption and not otherwise adulterated or injurious to health.

44.    Plaintiffs allege that the contaminated food that Defendants manufactured, distributed, and/or sold would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

45.    Plaintiffs further allege that the contaminated food that Defendants manufactured, distributed, and/or sold was not fit for the uses and purposes intended, *i.e.* human consumption, and that this product therefore constituted a breach of the implied warranty of fitness for its intended use.

46.    As a direct and proximate result of the Defendants' breaches of warranty, as set forth above, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

### Count III – Ordinary Negligence and Negligence *Per Se* Against All Defendants

47.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

48.    Defendants designed, manufactured, distributed, and sold food products that were contaminated by a harmful pathogen.

49.    Defendants owed a duty to all persons who consumed their food products, including Plaintiffs, to manufacture and sell food that was safe to eat, that was not adulterated with harmful pathogens, and that was not in violation of applicable food and safety regulations.

50.    Defendants had a duty to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, distribution, storage, labeling, and sale of their food

products. Defendants' manufacture, distribution, and sale of the contaminated food products that caused Plaintiffs' injuries were in breach of the duties imposed upon them under said statutory and regulatory provisions, including but not limited to the following code sections of the Arkansas State Board of Health's Rules and Regulations Pertaining to Food Establishments:

     a. 2-301.14, When to Wash;

     b. 2-401.11, Eating, Drinking or Using Tobacco;

     c. 3-301.11, Preventing Contamination from Hands;

     d. 3-302.11, Packaged and Unpackaged Food – Separation, Packaging, and Segregation;

     e. 3-501.16, Potentially Hazardous Food (Time/Temperature Control for Safety Food), Hot and Cold Holding;

     f. 4-601.11, Equipment, Food-Contact Surfaces, Nonfood-Contact Surfaces, and Utensils;

     g. 4-803.11, Storage of Soiled Linens; and

     h. 6-301.14, Handwashing Signage.

     51.    Plaintiffs were among the class of persons designed to be protected by these statutes and regulations pertaining to the manufacture, distribution, storage, and sale of similar food products. As a result, Defendants' actions in manufacturing, distributing, and selling the subject adulterated food products constituted negligence *per se*, for which Defendants are liable to Plaintiffs.

     52.    Further, Defendants breached the several duties owed to consumers of their food products, including Plaintiffs, by committing the following acts and omissions of negligence:

     a. Failing to adequately maintain or monitor the sanitary conditions of their products, premises, equipment, and employees, and the products, premises, equipment, and employees of other entities involved in the manufacture, preparation, service, or sale of the adulterated food products;

     b. Failing to properly operate their facilities and equipment in a safe, clean, and

sanitary manner;

c. Failing to apply their own food safety policies and procedures to ensure the safety and sanitary conditions of their food products, premises, and employees;

d. Failing to apply food safety policies and procedures that met industry standards for the safe and sanitary production of food products, and the safety and sanitary condition of their premises and employees;

e. Failing to prevent the transmission of bacteria to consumers of their food products;

f. Failing to hire appropriate and qualified employees and agents involved in the manufacture, preparation, service, and sale of their food products;

g. Failing to properly train their employees and agents regarding prevention of transmission of bacteria on their premises, from their facility or equipment, or into their food products;

h. Failing to properly supervise their employees and agents to prevent the transmission of bacteria on their premises, from their facility or equipment, or into their food products;

i. Failing to take reasonable steps and measures to monitor the individuals involved in the manufacture, preparation, service, and sale of the their products;

j. Retaining unfit and unqualified employees and agents involved in the manufacture, preparation, service, and sale of their food products; and

k. In further particulars which are believed will be disclosed upon the use of proper discovery procedures during the course of this litigation.

53.    As a direct and proximate result of Defendants' acts and omissions of negligence, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

## Count IV – *Res Ipsa Loquitor*

54.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

55.    Defendants had exclusive ownership and control of the contaminated food products produced, distributed, manufactured and/or sold at the Walmart's Home Office Café. These food products, of which Defendants had exclusive ownership and control, were purchased

and consumed by Plaintiffs.

56.     The contamination of food consumed by Plaintiffs was of such nature that it would not have ordinarily occurred but for the negligence of a person or entity with exclusive ownership and/or control of those food products.

57.     The contaminated food manufactured, distributed, and/or sold by Defendants, and consumed by Plaintiffs, was the sole cause of Plaintiffs' severe injuries and damages.

58.     As a direct and proximate result of Defendants' acts and omissions of negligence, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

### Count V – Vicarious Liability/*Respondeat Superior*

59.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

60.     At all times mentioned herein, the individuals participating in the production, distribution, manufacturing, and/or sale of the contaminated food products were the employees, agents, and/or apparent agents of Defendants. As such, Defendants are vicariously liable for the negligent acts and omissions of those individuals.

61.     Defendants' employees were negligent in the following particulars:

a. Failing to adequately maintain or monitor the sanitary conditions of their products, premises, and equipment;

b. Failing to properly operate their facilities and equipment in a safe, clean, and sanitary manner;

c. Failing to apply their superiors' food safety policies and procedures to ensure the safety and sanitary conditions of their food products and premises;

d. Failing to apply food safety policies and procedures that met industry standards for the safe and sanitary production of food products, and the safety and sanitary condition of their premises;

e. Failing to prevent the transmission of bacteria to consumers of their food products; and

f. In further particulars which are believed will be disclosed upon the use of proper discovery procedures during the course of this litigation.

62.     As a direct and proximate result of Defendants' acts and omissions of negligence, Plaintiffs sustained injuries and damages in amounts to be determined at trial.

## V. DAMAGES

63.     Plaintiffs have suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of each of the Defendants, in an amount greater than that required for federal diversity jurisdiction, which shall be fully proven at the time of trial.

64.     The damages include, but are not limited to, general pain and suffering; loss of enjoyment of life, both past and future; mental anguish, both past and future; medical injuries, both past and future; medical and medical-related bills and expenses, both past and future; emotional distress, past and future; pharmaceutical expenses, past and future; loss of income, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## VI. JURY DEMAND

65.     Plaintiffs hereby demand a jury trial.

## VII. PRAYER FOR RELIEF

For these reasons, Plaintiffs request judgment against the Defendants as follows: compensation for all general, special, incidental, and consequential damages in an amount greater than required for federal diversity jurisdiction; reasonable attorneys' fees and costs, to the fullest extent allowed by law; and all additional relief as this Court deems just and equitable.

DATED: September 15, 2016

Respectfully submitted,

KAREN CONE, LAURIE COX, AND
PATRICIA HOBACK

By:  _____

Sean T. Keith, Ark. Bar No. 93158
Mason L. Boling, Ark. Bar No. 2014172
Keith, Miller, Butler,
Schneider & Pawlik PLLC
224 S. 2nd Street
Rogers, Arkansas 72756
Phone: (479) 621-0006
Fax: (479) 631-6890
skeith@arkattorneys.com
mboling@arkattorneys.com

Jack T. Hyde, Mo. Bar No. 63903
*Pro Hac Vice Pending*
Mallory A. Vandyke, Mo. Bar No. 66110
*Pro Hac Vice Pending*
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Phone: (816) 701-1100
Fax: (816) 531-2372
jhyde@wcllp.com
mvandyke@wcllp.com

*ATTORNEYS FOR PLAINTIFFS*